UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN LICORICE COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>TOTAL SWEETENERS, INC., *individually and doing business as* BATORY FOODS, INC.,<br><br>    Defendant.<br>_____/ | No. C-13-1929 EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT TOTAL SWEETENERS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(Docket No. 94)** |

## I. INTRODUCTION

Plaintiff American Licorice Company manufactures black licorice candy under the brand name "Red Vines." The California Department of Public Health (CDPH) determined that some of Plaintiff's black licorice candy manufactured in 2012 contained quantities of lead significantly in excess of permissible levels, and ordered a recall. Plaintiff later performed an investigation into the adulteration of its candy, and concluded that the excess lead originated in molasses it purchased from Defendant Total Sweeteners, Inc.[1]

This Court previously ruled that a December 2011 Sales Contract (the Sales Contract) between the parties was a valid and binding agreement. Docket No. 31 at 12. The Court further determined that whether a subsequently exchanged Purchase Order was a valid modification of the Sales Contract was a question of law governed under Section 2-209 of the Uniform Commercial

---

[1] Total Sweeteners does business as "Batory Foods," and the parties refer to the entities interchangeably in both documents and deposition testimony.

Code, but that the issue of the Purchase Order's validity could not be determined on a motion to dismiss. Docket No. 31 at 12. Defendant now moves for summary judgment that the Purchase Order was not a valid modification of the Sales Contract, and hence its provisions do not apply. Defendant further moves for summary judgment that the terms of the governing Sales Contract bar all – or at least a considerable number of – Plaintiff's claims.

For the reasons explained below, the Court grants in part and denies in part Defendant's motion for summary judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiff is a manufacturer and distributor of candy, and has a production facility in Union City, California, where it makes black licorice. First Amended Complaint (FAC) ¶ 2 (Docket No. 19).[3] Defendant is a manufacturer and distributor of sugar-derived products for use in food products, such as molasses. FAC ¶ 3. Prior to February 2012, Defendant was not Plaintiff's primary molasses supplier, but Plaintiff did occasionally purchase molasses from Defendant. FAC ¶¶ 12-13. These purchases were accomplished via purchase orders issued from Plaintiff to Defendant, and printed on Plaintiff's own form, that set out the specific terms and conditions for the purchase of the molasses, including warranty information. *Id*; Carff Decl. at ¶ 4 (Docket No. 98). Plaintiff's purchase orders also disclaimed all liability for consequential, special, or punitive damages. Carff Decl. Ex. A.

In December 2011, the parties entered into a binding contract for the delivery of molasses for the 2012 calendar year ("Sales Contract"). FAC ¶ 14; Docket No. 31 at 12. This Sales Contract was prepared by Defendant and provides a per pound price for the molasses ($.3575 per pound), and specifies a total quantity of molasses to be delivered during the course of the year (1,500,000 pounds). FAC Ex. A; Saroni Depo. at 88:25-92:9 (Docket No. 94-2). While the contract does not contain a specific delivery schedule, there is a note stating "[t]wo truckload per order please," and another indicating "[e]ven draws across contract period required unless otherwise specified." *Id.* A

---

[2] The facts are presented in the light most favorable to the non-moving party, American Licorice.

[3] Because the facts of this case are largely undisputed, and because the Court must view the facts in the light most favorable to the non-moving party, here Plaintiff, the Court cites to allegations in the First Amended Complaint as appropriate where those allegations are conceded by Defendant.

2

"truckload" is an industry standard measurement, and is equivalent to 48,000 pounds of molasses. Carff Depo at 53:9-15 (Docket No. 94-5).

The second page of the Sales Contract contains a number of terms and conditions in small print. *Id.* The three provisions at issue in Defendant's summary judgment motion all appear in the section entitled "WARRANTY," and are highlighted below in bold:

> WARRANTY: SELLER expressly warrants that any goods contracted herein will be representative of the brand or grade specified herein to be sold, and will comply with all of the applicable provisions of the Federal Food, Drug and Cosmetic Act and of any applicable State Pure Food and Drug Act. **Buyer hereby waives any claim or defense based on the quality of the commodities specified herein, unless** (1) within ten (10) days after BUYER learns by use or otherwise of the defect complained of but in any event **within forty-five (45) days after receipt of notice of arrival of said commodities at destination, BUYER sends SELLER at SELLER'S main office a letter by registered mail specifying the nature of the complaint**; and (2) within said forty-five (45) days sends by parcel post or express prepaid to SELLER'S said office a five (5) point sample of the goods alleged to be defective or inferior, provided that compliance by BUYER with the above enumerated steps shall not constitute an admission by SELLER of the merits or amount of BUYER'S said claim or defense.
>
> **Except as expressly set forth herein, SELLER states that no warranties, express or implied, contained in the uniform commercial code or otherwise (including, without limitation, the implied warranty of fitness for a particular purpose) shall apply to the products sold hereunder and BUYER acknowledges that except as expressly set forth in the first sentence of this section, it is purchasing the goods, "as is" and "where is"**. SELLER is not responsible for any misuse, reconfiguration or alteration of the goods by purchaser or others. **SELLER shall in no event be liable for consequential, special or punitive damages hereunder**.

*Id* (emphases added). The Sales Contract provides that it shall be construed in accordance with Illinois law. *Id.* The contract is signed by Dennie V. Carff, who works for Plaintiff and had independent authority to enter into contracts on behalf of American Licorice. Carff Depo at 54:15-21. Mr. Carff testified that he believed the Sales Contract was a valid contract. *Id.* at 69:21-70:3.

Prior to the first shipment of molasses under the Sales Contract, Plaintiff sent a form titled "Purchase Order" to Defendant. FAC ¶ 15; FAC Ex. B. The Purchase Order requested that 48,000 pounds of molasses (*i.e.*, one "truckload") be delivered on February 29, 2012, and another truckload on March 2, 2012, both at the price specified in the Sales Contract. *Id.* The Purchase Order appears

1 to have been signed by Mr. Carff, but not by any representative of Defendant. *Id.* Mr. Carff
2 testified that at the time he sent the Purchase Order, he believed it was sent "under the [Sales]
3 [C]ontract,"[4] and further testified that he did not believe the Purchase Order was a separate binding
4 contract. Carff Depo. at 70:8-17; 95:23-96:6 (emphasis added).

5 Similar to the Sales Contract, the Purchase Order has a reverse side laying out various terms
6 and conditions. FAC Ex. B. Unsurprisingly, as the Purchase Order was prepared by Plaintiff, the
7 terms and conditions vary in a number of ways that are generally more favorable to American
8 Licorice (*e.g.*, there is no notice provision). *Id.* The Purchase Order provides that it shall be
9 construed in accordance with the laws of the state of Oregon. *Id.*

10 After Plaintiff sent the Purchase Order, Defendant delivered molasses to Plaintiff's facility in
11 Union City, California, in accordance with the quantity, shipment, and price terms in that order, and
12 thereafter billed Plaintiff. FAC ¶ 18. Plaintiff subsequently sent Defendant additional orders using
13 the same purchase order form, and Defendant continued to provide periodic shipments of molasses
14 through at least August 2012. FAC ¶ 19. From February through August 2012, Defendant was the
15 only molasses supplier to Plaintiff's Union City location, and the only supplier of molasses for the
16 black licorice products that are the subject of this lawsuit. FAC ¶ 20. Molasses is the major
17 constituent and first listed ingredient in Plaintiff's black licorice. FAC ¶ 21.

18 On or about August 21, 2012, Plaintiff was visited by the CDPH and informed that at least
19 one lot of its black licorice was tested and found to contain levels of lead in excess of the 0.1 parts
20 per million (ppm) limit set by the United States Food and Drug Administration (FDA) for candy
21 frequently consumed by small children. FAC ¶ 22; Silva Decl. Exs. 1 & 2 (Docket No. 100). Both
22 the FDA and the CDPH consider candy with lead content above this level to be adulterated. FAC ¶
23 22. California and various other jurisdictions prohibit the sale of candy which contains lead in
24 excess of 0.1 ppm. *Id.* As a result of the testing, the CDPH requested that Plaintiff recall the
25 affected lot of black licorice from all stores and retail customers. FAC ¶ 23. Plaintiff worked with
26 CDPH to implement the recall. *Id.*

---

[4] Mr. Carff also testified that he understood that he was sending purchase orders to Defendant "pursuant to" the Sales Contract. Carff Depo at 88:15-19.

The "Best Buy" date on the first affected lot indicated that it was manufactured in May 2012. FAC ¶ 24. Plaintiff launched an investigation into the contamination, which included testing a range of its finished products for lead. FAC ¶ 27. Plaintiff also tested all of the ingredients contained in its black licorice manufactured in May 2012. FAC ¶ 28. Plaintiff determined that the lots of black licorice manufactured in 2011 (prior to the receipt of Defendant's molasses) contained significantly less lead than 0.1 ppm, while the lots manufactured in May 2012 or later contained lead levels significantly in excess of 0.1 ppm. FAC ¶¶ 25-26. Black licorice from the May 2012 lot had lead levels around 0.27 to 0.33 ppm. FAC ¶ 27; Silva Decl. Ex 1. Black licorice produced in July and early August 2012 had lower lead levels, but still contained lead in excess of 0.1 ppm. *Id.* Plaintiff claims that the testing of all the ingredients used in making the black licorice showed that the elevated lead levels were due to the molasses supplied by Defendant rather than to the other ingredients. FAC ¶ 28.

After the internal investigation and testing, Plaintiff was compelled to expand the recall to include all of its black licorice available for sale or already in the possession of consumers throughout the United States, including packages containing mixed red and black licorice. FAC ¶ 29. Plaintiff also temporarily halted production of black licorice. *Id.* As a result of the recalls, Plaintiff claims it incurred substantial costs and damage, including to its reputation and future sales. FAC ¶ 30.

Plaintiff brought suit against Defendant alleging four causes of action: (1) breach of contract; (2) breach of express warranty; (3) breach of the implied warranty of merchantability; and (4) breach of the implied warranty of fitness. The original complaint, filed on April 26, 2013, included these four claims, but relied solely on the December 2011 Sales Contract, without reference to the February 2012 Purchase Order or other subsequent purchase orders. Docket No. 1 ¶¶ 11-12, Ex. A. Defendant filed a motion to dismiss on May 20, 2013, arguing that all of Plaintiff's claims failed under the terms of the Sales Contract because Plaintiff did not comply with the contract's 45-day notice provision. Docket No. 11. Alternatively, Defendant argued that certain of Plaintiff's claims were barred by various other waiver provisions contained in the Sales Contract. *Id.* Rather than substantively respond to the motion, Plaintiff filed its first amended complaint on May 31, 2013,

which added allegations about the February 2012 Purchase Order. Docket No. 19. Defendant once again filed a motion to dismiss. Docket No. 22.

On August 13, 2013, this Court denied Defendant's motion to dismiss. Docket No. 31. The Court first held that the Sales Contract was a valid and legally binding contract between the parties. *Id.* at 9-12. The Court further held that whether the Purchase Order was a valid modification of the Sales Contract depended on the application of Uniform Commercial Code § 2-209. *Id.* at 12. At the motion to dismiss stage, however, the Court determined that "[t]he question as to whether Defendant assented to the terms of the Purchase Order when it shipped the molasses in response to the Purchase Orders sent by Plaintiff over the spring and summer of 2012 is [] properly one for resolution by the jury." *Id.* at 16. Because the Court did not determine which contract governed the transactions between the parties, the Court declined to consider Defendant's arguments that the terms of the Sales Contract barred all or some of Plaintiff's claims.

On August 14, 2014, Defendant filed its motion for summary judgment. In its motion, Defendant argues: (1) the Purchase Order is not a valid modification of the Sales Contract; (2) a 45-day notice period contained in the Sales Contract bars a significant number of Plaintiff's claims; (3) the Sales Contract effectively disclaims all express and implied warranties; and (4) the Sales Contract effectively disclaims all liability for consequential damages. Docket No. 94. After reviewing the parties' briefs, the Court concluded it would benefit from supplemental briefing from Plaintiff on the principles governing the modification of existing contracts under U.C.C. Section 2-209. Docket No. 104. Plaintiff filed its supplemental brief on September 23, 2014. Docket No. 105. The Court held a hearing on this motion on October 9, 2014.

### III. DISCUSSION

A. Legal Standard for Summary Judgment Motion

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See*

6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See Cameron v. Craig*, 713 F.3d 1012, 1015 (9th Cir. 2013) (citation omitted).

Where the movant has the ultimate burden of proof at trial, it may prevail on a motion for summary judgment only if it affirmatively demonstrates that there are no genuine disputes regarding any essential element of its claim. *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). Once it has met the initial burden of showing the absence of any genuine dispute, the burden shifts to the opposing party to present "'significant probative evidence tending to support its claim or defense.'" *Id.* (quoting *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991)). In contrast, where the nonmovant has the ultimate burden of proof, the movant may prevail on a motion for summary judgment simply by pointing to the nonmovant's failure "to make a showing sufficient to establish the existence of an element essential to [the nonmovant's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

B.     The Purchase Order is Not a Valid Modification of the Sales Contract

Because this is a breach of contract case, the Court must determine which contractual terms apply to the transactions at issue in this case. This Court previously ruled at the motion to dismiss stage that the Sales Contract is a binding agreement between the parties, but further held that whether the Plaintiff's Purchase Order validly modified the terms of the Sales Contract would not be determined in the motion to dismiss. Docket No. 31 at 15. Specifically, the Court found the "parties' course of conduct ambiguous as to whether the Defendant's shipment of molasses was simply pursuant to the original Sales Contract, or whether it was in response to Plaintiff's Purchase Order and implicitly indicated assent to the terms contained therein." *Id.* at 18.

In its summary judgment briefing, Defendant argues for the first time that where, as here, a party's performance is entirely consistent with both the original contract and an alleged

7

1 modification, that performance cannot be used to show assent to the proposed modification.[5] As one
2 court put it, "[a]ctions taken in accordance with an existing contractual obligation cannot indicate
3 assent to a modification thereof. For a party's course of performance to indicate assent to a
4 modification, the performance must . . . differ from the performance already required of the party by
5 the existing contract." *TRA Indus. v. Valspar Corp.*, 72 U.C.C. Rep. Serv. 2d 808 (W.D. Wash.
6 2010) (citing *Arizona Retail Sys. v. Software Link*, 831 F. Supp. 759 (D. Ariz. 1993); *Alaska Pacific
7 Trading Co. v. Eagon Forest Prods.*, 933 P. 2d 417 (Wash. Ct. App. 1997)). Defendant thus argues
8 that it is entitled to summary judgment that the Purchase Order was not a valid modification of the
9 Sales Contract, because the only evidence of Defendant's assent to the terms of the Purchase Order
10 (*i.e.*, Defendant's shipment of molasses) is conduct entirely consistent with the terms of the Sales
11 Contract, and is therefore legally insufficient to defeat Defendant's motion for summary judgment.

12 Defendant's argument is correct. Courts interpreting § 2-209 of the Uniform Commercial
13 Code have consistently held that a party's assent to a purported contract modification "cannot be
14 inferred merely from a party's conduct in continuing with [an existing] agreement."[6] *United States
15 Surgical Corp. v. Orris, Inc.*, 5 F. Supp. 2d 1201, 1206 (D. Kan 1998); *see also Western Sky Indus.
16 v. Colttech, LLC*, 69 U.C.C. Rep. Serv. 2d 566 (D. Kan 2009) ("The fact that a party continues in a
17 contract after additional or different terms have been received by that party is not sufficient to
18 establish consent to those additional or different terms"); *Wachter Mgmt. Co. v. Dexter & Chaney,
19 Inc.*, 144 P. 3d 747, 755 (Kan. 2006) (holding that a party's "actions in continuing the preexisting
20 contract do not constitute express assent to the terms" contained in a later proposal to modify that
21 contract).

---

[5] Plaintiff admits that the performance required under the Purchase Order is entirely consistent with the performance required under the Sales Contract. Docket No. 105 at 3.

[6] This Court previously rejected Plaintiff's arguments regarding the applicability of U.C.C. § 2-207, which governs which terms are included in a contract where the provisions of an offer and acceptance conflict. Docket No. 31 at 12. In its supplemental brief, Plaintiff again argues that § 2-207 should apply. Docket No. 105 at 6-7. Plaintiff's renewed argument is no more persuasive now than when it was first raised, and is once again rejected. Because the Sales Contract constitutes a complete and binding agreement, there is no need for this Court to apply § 2-207's "gap filler" provisions. Instead, this Court must determine whether the Purchase Order was a valid modification under § 2-209.

The rule is a sensible one: Where a party is already contractually obligated to provide a certain performance, and the party in fact performs, it is reasonable to assume the party was acting to satisfy its obligations under the original agreement, regardless of whether it received subsequent requests for the exact same performance. Absent an express consent to the modification, courts should be reluctant to find a modification of an existing contract unless manifestation of that assent is clear. Such assent may not be inferred from ambiguous conduct.

Plaintiff admits it found no authorities applying § 2-209 that are contrary to those cited above. Docket No. 105 at 6. Instead, Plaintiff attempts to distinguish the above cases on the ground that each involved situations where a seller sought to enforce new terms that were first provided to the buyer at the time the goods were delivered, whereas here Plaintiff sent its new terms to Total Sweeteners *before* Total Sweeteners shipped its molasses to Plaintiff. Plaintiff thus argues that unlike the parties in the cited cases, Total Sweeteners simply could have refused to ship its product had it wanted to avoid adopting the terms of the Purchase Order.

While the above cases are factually distinguishable from the situation here, the general rule adopted in cases such as *TRA Industries* should apply in this situation. The rationale of the cases turns on the nature of the course of performance and its consistency with existing contract obligations, not on the timing of the proposed modification.

Aside from Defendant's shipment of molasses, Plaintiff cites no other evidence to show that Defendant intended to assent to the terms of the Purchase Order. In fact, Defendant provided evidence that it never intended to assent to the Purchase Order's terms. For instance, Defendant's employee in charge of the American Licorice account testified without contradiction that she never even saw the Purchase Order. Saroni Depo. at 98:1-8; 110:15-25 (Docket No. 94-2). The only Defendant employee who did receive Plaintiff's Purchase Orders testified that she never read (or discussed with Plaintiff) the additional terms and conditions, nor was she trained to input those terms into Defendant's computer system. Moser Depo. at 16:10-21; 17:19-25; 22:5-9 (Docket No. 94-3). Further, Plaintiff's employee in charge of contracting with Defendant testified at his deposition that he never discussed the terms of the Purchase Order with Defendant's employees, that he assumed the purchase orders were issued "pursuant to" the existing Sales Contract, and that he

9

did not believe the Purchase Orders created a separate binding contract. Carff Depo. at 70:8-17; 88:15-19; 95:23-96:6 (emphasis added). Plaintiff does not present evidence to the contrary. Finally, it bears noting that Plaintiff's original complaint did not invoke the Purchase Order; Plaintiff only added its allegations under the Purchase Order in response to Defendant's invocation of the putative defenses contained in the Sales Contract.

Because Defendant's performance was consistent with both the Sales Contract and the Purchase Order , it fails to establish assent to the terms of the Purchase Order. Thus, Defendant is entitled to partial summary judgment that the Sales Contract applies unmodified by the Purchase Order.

C. <u>Summary Judgment is Inappropriate Regarding the Sales Contract's 45-Day Notice Period</u>

Defendant argues that most of Plaintiff's claims are barred by a provision in the Sales Contract that provides that Plaintiff "hereby waives any claim or defense based on the quality of the commodities specified herein" unless Plaintiff notifies Defendant of any such claim "within forty-five (45) [days] after receipt of notice of arrival of said commodities at destination . . . ." FAC Ex. A. Because Plaintiff admits[7] it did not notify Defendant within 45 days of receipt of the lion's share of the allegedly adulterated molasses, Defendant argues that all claims with respect to those shipments are waived.[8]

Under Illinois law and the Uniform Commercial Code, a party which has accepted goods from a seller must notify the seller of any breach "within a reasonable time after he discovers or should have discovered any breach." 810 Ill. Comp. Stat. 5/2-607(3)(a). While "the effect of provisions of the Uniform Commercial code may be varied by agreement," 810 Ill. Comp. Stat. 5/1-302(a), "[w]henever the Uniform Commercial Code requires an action to be taken within a reasonable time, [only] a time that is not manifestly unreasonable may be fixed by agreement." 810

---

[7] Michals Decl. ¶ 2; Michals Decl. Ex. 1 (Docket No. 99).

[8] In its opening brief, Defendant claimed that all of Plaintiff's claims were waived as untimely. Docket No. 94 at 25-26. In its reply, however, Defendant acknowledges that Plaintiff timely notified Defendant regarding at least the final two deliveries of adulterated molasses. Docket No. 103 at 15. Thus, even if the notice provision did apply, it would not bar all of Plaintiff's claims.

1  Ill. Comp. Stat. 5/1-302(b). Thus the key question governing the validity of the Sales Contract's
2  notice provision is whether the 45-day requirement is "manifestly unreasonable" under the
3  circumstances.

4        The parties devote a considerable portion of their papers arguing over whether the 45-day
5  notice period is or is not reasonable. But at this stage of the litigation these arguments are largely
6  academic: Under Illinois law, whether the amount of notice given by a plaintiff "was reasonable
7  under the circumstances is ordinarily a question for the jury, unless no inference could be drawn
8  from the evidence but that the notice was unreasonable." *Hays v. General Elec. Co.*, 151 F. Supp.
9  2d 1001, 1012 (N.D. Ill. 2001) (citing *Maldonado v. Creative Woodworking Concepts, Inc.*, 694
10 N.E. 2d 1021, 1026 (Ill. Ct. App. 1998)); *see also Goldstein v. G.D. Searle & Co.*, 378 N.E. 2d
11 1083, 1088 (Ill. Ct. App. 1978) (reversing trial court's grant of summary judgment where there
12 existed a "genuine issue of fact . . . on the reasonableness of plaintiff's notice" of breach). Thus, this
13 Court can only grant summary judgment to Defendant if it concludes that a 45-day notice
14 requirement is manifestly reasonable under these circumstances as a matter of law. *See Maldonado*,
15 694 N.E. 2d at 1026 (holding that an eleven month delay was not unreasonable as a matter of law
16 where there was no evidence of prejudice to the seller or bad faith of the buyer).

17       Plaintiff has presented at least some evidence from which a reasonable jury could conclude
18 that the 45-day notice provision is manifestly unreasonable under these circumstances. Namely,
19 Plaintiff asserts that the defect in the Defendant's molasses was not detectable at the time of delivery
20 (*i.e.*, it was a latent defect), and that it is not standard industry practice to test for, or certify, heavy
21 metal levels in products like molasses. Shepardson Decl. Ex. B (Docket No. 97-2), Jarrard Depo at
22 55:3-12. Because Plaintiff contends that it had no reason to suspect the molasses would contain
23 significant amounts of lead, it argues that it would be unreasonable to bar its claims for failing to
24 notify Defendant of this latent defect within 45 days of receipt of the molasses. Defendant, by
25 contrast, argues that Plaintiff knows molasses contains at least some naturally occurring lead, and

1  thus should have known to test the molasses for lead on delivery.[9]  Boone Reply Decl. Ex. A, Jarrard
2  Depo. at 105:10-18 (Docket No. 103-2).  The competing evidence demonstrates the existence of a
3  genuine issue of material fact regarding the reasonableness of the duration of the notice provision
4  sufficient to defeat Defendant's motion for summary judgment.  Defendant's summary judgment
5  motion regarding the Sales Contract's 45-day notice period is hereby denied.

D.   The Sales Contract Does Not Effectively Disclaim Either Express or Implied Warranty Claims

Defendant next argues that the Sales Contract disclaims all warranties, both express and implied.  Docket No. 94 at 27; Docket No. 103 at 15-16.  Defendant is incorrect that the Sales Contract disclaims express warranties.  By the Sales Contract's very terms, "SELLER states that no warranties, express or implied . . . shall apply . . . *except as expressly set forth in the first sentence of this section.*"[10]  FAC Ex. A (emphasis added).  And the first sentence of the relevant section reads:

> WARRANTY**:**  SELLER expressly warrants that any goods contracted herein will be representative of the brand or grade specified herein to be sold, and will comply with all of the applicable provisions of the Federal Food, Drug and Cosmetic Act and of any applicable State Pure Food and Drug Act.

*Id*.  Put simply, Defendant expressly warranted that its molasses would be "representative of the brand or grade specified herein to be sold," and would "comply with all of the applicable provisions of the Federal Food, Drug and Cosmetic Act" as well as applicable state laws.  *Id.*  The Sales Contract explicitly preserves this express warranty.  Consequently, summary judgment on Plaintiff's express warranty claim is denied.

Summary judgment is similarly unavailable on Plaintiff's implied warranty claims.  Unlike express warranties, which are explicitly preserved in the Sales Contract, the Sales Contract does

---

[9] While the Defendant makes much of the fact that molasses naturally contains lead, it is interesting to note that Defendant's Senior Product Manager testified that the natural lead content of molasses is typically well below the .1 ppm level necessary to violate FDA and state health standards.  Shepardson Decl. Ex. B, Jarrard Depo at 99:10-15; Boone Reply Decl. Ex. A, Jarrard Depo. at 106:1-10.

[10] The Sales Contract also states that "Except as expressly set forth herein," no express warranty claims are cognizable.  FAC Ex. A.  This language further indicates that express warranties "set forth herein" are *not* disclaimed.

12

purport to waive all implied warranties. The Court determines, however, that the implied warranty waivers are ineffective as a matter of law.

The parties agree that under Illinois law, the validity of warranty waivers is governed by 810 Ill. Comp. Stat. 5/2-316, which is titled "Exclusion or modification of warranties." *See* Docket No. 96 at 12-14; Docket No. 103 at 15. The relevant language of Section 5/2-316 reads as follows:

> to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous . . .

810 Ill. Comp. Stat. 5/2-316(2). By statute, the implied warranty waivers in the Sales Contract must be "conspicuous" in order to be effective.[11] Under Illinois law, conspicuousness is a question of law for determination by the court, 810 Ill. Comp. Stat. 5/1-201(10), and typically requires:

> (A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
>
> (B) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

*Id.* There can be no real dispute that at least the second of these requirements is not met. The language disclaiming all implied warranties is printed in minuscule type and is buried among numerous other terms and conditions that fill the entire page from margin to margin. FAC Ex. A. The type disclaiming implied warranties is in no way "set off" from the surrounding text, is in the same font as the surrounding text, and bears no "marks that call attention to the language." 810 Ill. Comp. Stat. 5/1-201(10)(B). There is simply no colorable argument that the language in the Sales Contract purporting to disclaim all implied warranties was sufficiently conspicuous to be

---

[11] There is at least some question whether Illinois courts would find a warranty waiver which contains terms like "as is" and "with all faults" to be sufficiently conspicuous as a matter of law. *See* 810 Ill. Comp. Stat. 5/2-316(3)(a) ("all implied warranties are excluded by expressions like 'as is' . . . or other language which in common understanding calls the buyer's attention to the exclusion of warranties . . . .") Because the parties did not raise this issue, the Court declines to reach it.

enforceable under Illinois law. Thus, Defendant's summary judgment motion on this point is denied.

E.     The Consequential Damages Waiver in the Sales Contract is Valid as a Matter of Law

Defendant's final contention is that all of Plaintiff's claims for consequential damages are barred by a damages waiver provision contained in the Sales Contract. That provision states that "SELLER shall in no event be liable for consequential, special or punitive damages hereunder." FAC Ex. A.

Whether the Sales Contract's consequential damages waiver is valid is a question of Illinois law specifically governed by § 2-719 of the Uniform Commercial Code, codified at 810 Ill. Comp. Stat. 5/2-719. *See Razor v. Hyundai Motor America*, 854 N.E. 2d. 607, 615 (Ill. 2006). That statutory provision, titled "Contractual Modification or Limitation of Remedy," provides that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." 810 Ill. Comp. Stat. 5/2-719(3). Thus, "[c]ontractual limitations or exclusions of consequential damages will be upheld unless to do so would be unconscionable." *Razor*, 854 N.E. 2d. at 622; *see also Intrastate Piping & Controls, Inc. v. Robert-James Sales, Inc.*, 733 N.E. 2d 718, 725 (Ill. Ct. App. 2008) (stating that while "the Uniform Commercial Code disfavors contractual provisions which leave the non-breaching party without a remedy, it does not disfavor limits on recoverable damages" such as those restricting "incidental, as well as consequential, damages").

Under Illinois law, the "determination of whether a contract or portion of a contract is unconscionable is a question of law" to be decided by the court. *Kinkel*, 857 N.E. 2d. at 264 (citing *Razor*, 854 N.E. 2d. at 622). A finding of unconscionability "may be based on *either* procedural *or* substantive unconscionability, or a combination of both." *Id.* at 263 (emphasis added) (citation omitted). For the reasons explained below, the Sales Contract's damages waiver provision is not unconscionable, and will hence be enforced.

1.     Procedural Unconscionability

"Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it." *Kinkel*, 857 N.E. 2d. at 264 (citation omitted). In *Kinkel*, the Illinois Supreme Court cited

14

extensively and approvingly from *Frank's Maintenance & Engineering Inc. v. C.A. Roberts Co.*, 408 N.E. 2d 403 (Ill. Ct. App. 1980) when articulating the precise factors that typically inform whether a contract term is procedurally unconscionable. Specifically, the Supreme Court held that a reviewing court should consider "all of the circumstances surrounding the transaction," with particular emphasis on whether (1) "each party had a reasonable opportunity to understand the terms of the contract," and (2) "whether important terms were hidden in a maze of fine print." *Id.* (quoting *Frank's Maintenance*, 408 N.E. 2d at 410). The Supreme Court further noted that "[t]o be part of the bargain, a provision limiting the defendant's liability must, unless incorporated into the contract through prior course of dealings or trade usage, have been bargained for, brought to the purchaser's attention or be conspicuous." *Id.* (quoting *Frank's Maintenance*, 408 N.E. 2d at 410). If a liability waiver does not meet these conditions, then "the seller has no reasonable expectation that the remedy was being so restricted and the restriction cannot be said to be part of the agreement of the parties." *Frank's Maintenance*, 408 N.E. 2d at 410.

Here, certain factors support a finding of procedural unconscionability. Most significantly, the Sales Contract's damages waiver was "hidden in a maze of fine print."[12] *Frank's Maintenance*, 408 N.E. 2d at 410. Nor is there any real dispute that the damages waiver was otherwise inconspicuous as a matter of Illinois law. *See* 810 Ill. Comp. Stat. 5/1-201(10). For instance, the liability waiver has no independent heading – in fact it is misleadingly included at the bottom of a section entitled "Warranty" – and the waiver is printed in type that is no larger than its surrounding type or is otherwise "set off from" the surrounding text of the same size. Like the waiver of implied warranties found inconspicuous above, the damages waiver provision in the Sales Contract is also inconspicuous.

Nevertheless, at least two factors weigh strongly against a finding of procedural unconscionability. First, the terms and conditions of the Sales Contract were "brought to the purchaser's attention" *Frank's Maintenance*, 408 N.E. 2d at 410, on the first page of the contract, which states that American Licorice agrees to "buy from seller the following products on the terms

---

[12] As previously indicated, the Terms and Conditions sheet is printed in minuscule type that fills an entire page from margin to margin. FAC Ex. A.

1  and conditions and subject to the agreements stated below and/or on the TERMS AND
2  CONDITIONS statement." FAC Ex. A. Under Illinois law, a challenged provision "hidden in a
3  maze of fine print where it is unlikely to be noticed, much less read" may nevertheless be considered
4  part of the bargain if the provision "was brought to the [party's] attention elsewhere in the contract."
5  *Tortoriello v. Gerald Nissan of North Aurora, Inc.*, 882 N.E. 2d 157, 175 (Ill. Ct. App. 2008)
6  (internal alteration omitted) (citing *Kinkel*, 828 N.E. 2d at 812). Thus in *Tortoriello*, the appellate
7  court held that an otherwise inconspicuous arbitration clause "ensconced in one of several
8  paragraphs in a page of densely packed, minute print," was not procedurally unconscionable because
9  the front page of the relevant contract contained the bolded and all-capitalized statement "SUBJECT
10 TO TERMS & CONDITIONS ON REVERSE SIDE . . . ."[13] *Id.* at 176.

11     Second, and perhaps more significantly, there is evidence that the consequential damages
12 waiver is not procedurally unconscionable because it was "incorporated into the contract through
13 prior course of dealings or trade usage." *Frank's Maintenance*, 408 N.E. 2d at 410. Specifically,
14 Plaintiff submitted evidence that prior to the Sales Contract's effective date, Plaintiff purchased
15 molasses from Defendant on at least thirteen separate occasions using its own form contract. Carff
16 Decl. at ¶ 4. Crucially, those thirteen purchase orders all contain a waiver of consequential damages
17 nearly identical to the one contained in the Sales Contract.[14] Carff. Decl Ex. A. Indeed, the only
18 true distinction between the waiver in the Sales Contract and the waiver in Plaintiff's previously
19 exchanged purchase orders is that the waiver in the Sales Contract inures in Defendant's favor,

---

[13] Interestingly, it does not appear necessary to call attention to the specific challenged provision in order to defeat a claim of procedural unconscionability under Illinois law. Rather, all that is required is that the contract sufficiently alert the parties that the contract contains *some* additional terms and conditions. Essentially, it appears that parties in Illinois are presumed to have sufficient notice of even inconspicuous provisions as long as they knew the contract had additional terms and conditions, and "could have read them if [they] had chosen to do so." *Kinkel*, 857 N.E. 2d at 266.

[14] Plaintiff repeatedly claims in its papers that the thirteen purchase orders do *not* contain a consequential damages limitation similar to the one contained in the Sales Contract. Docket No. 96 at 18. This assertion is baffling and is directly contradicted by the record. *See* Carff Decl. Ex. A. ("In no event shall Purchaser be liable for any loss of profits or business, any consequential, special, indirect or punitive damages, even if Purchaser has been advised of the possibility of such damages.") At oral argument, Plaintiff conceded that its Purchase Orders do disclaim consequential damages.

1  while the waiver in the purchase orders inures in Plaintiff's favor. In these circumstances, it seems
2  unlikely that the Plaintiff would truly be surprised to learn that the Defendant's Sales Contract also
3  purports to disclaim liability for consequential damages. Rather, it appears likely that a
4  consequential damages waiver was (or should have been) expected because it was "incorporated into
5  the [Sales] [C]ontract through prior course of dealings or trade usage." *Frank's Maintenance*, 408
6  N.E. 2d at 410. Thus, the Court finds that the Sales Contract's damages waiver is not procedurally
7  unconscionable, despite the fact that it was inconspicuous.

        2.       <u>Substantive Unconscionability</u>

        Under Illinois law, the test of substantive unconscionability for contracts between business entities is "whether the [challenged] terms themselves are commercially reasonable." *Frank's Maintenance*, 408 N.E. 2d. at 410; *accord Kinkel*, 857 N.E. 2d at 267. Although the plaintiff's contention that the damages waiver is substantively unconscionable is a close call, the Court finds the clause is not substantively unconscionable. And even if it were, the Court concludes that the damages waiver would not be sufficiently substantively unconscionable as to warrant invalidating the clause given the lack of procedural unconscionability.[15] *See Intrastate Piping*, 733 N.E. 2d at 725 (Illinois law "does not disfavor limits on recoverable damages" such as those restricting "incidental, as well as consequential, damages").

        Plaintiff argues otherwise and relies exclusively on *Frank's Maintenance* to support its position that the damages waiver is substantively unconscionable. There, plaintiff purchased steel tubing from defendant for incorporation into plaintiff's motorcycle parts. *Id.* at 405. When plaintiff went to process the steel, it discovered that the steel was "pitted and corroded" rendering it "useless and dangerous for the high-stress purposes for which it was ordered." *Id.* The Court noted that such defects were "highly unusual," would be "invisible to the naked eye" and were typically not tested

---

[15] While Illinois law does not require both procedural and substantive unconscionability in order to invalidate a contractual provision, Illinois courts are more likely to find a clause unconscionable where both types of unconscionability are present. *See, e.g.*, *Crown Mortgage Co. v. Young*, 989 N.E. 2d 621, 624 (Ill. Ct. App. 2013) ("Standing alone, this procedural unconscionability might be insufficient to invalidate [the] contract. However, it more than suffices once combined with an even stronger showing of substantive unconscionability."). That is, less procedural or substantive unconscionability is required to invalidate a clause when at least some of each type of unconscionability is present. *Id.*

17

for by parties in plaintiff's position because "the quality control procedure of [steel] manufacturers usually mak[es] such testing unnecessary." *Id.* As a consequence of the defect, plaintiff incurred significant damages, including consequential damages, such as the cost of storing and eventually scrapping the defective steel, as well as the cost of effecting cover. *Id.* at 406-07.

The *Frank's Maintenance* court found that the consequential damages limitation in that case was unconscionable. Defendant correctly points out, however, that nearly all of the unconscionability analysis in *Frank's Maintenance* addressed procedural unconscionability. As later courts have recognized, the unconscionability analysis in *Frank's Maintenance* turned heavily on the fact that an advisement alerting the reader to terms and conditions on the reverse side of the contract had been "stamped over, suggesting that the obscured language was irrelevant and could be ignored" and the fact that the damages waiver itself was inconspicuous. *Kinkel*, 857 N.E. 2d at 250 (discussing the facts of *Frank's Maintenance*). Indeed, the only factor that appears to have been at all relevant to the question of substantive unconscionability was the fact that the defects in the steel were latent. *See Frank's Maintenance*, 408 N.E. 2d at 411 (discussing procedural unconscionability at length and then noting in one sentence, and without analysis, that "[f]urthermore, the defects in the steel allegedly were latent").

Plaintiff's reliance on *Frank's Maintenance* is misplaced. Nothing in the opinion suggests the court would have found the consequential damages limitation unenforceable absent the significant procedural unconscionability found by the court. *Frank's Maintenance* did not hold that a waiver of consequential damages is *per se* invalid where defects are latent, regardless of the absence or presence of procedural unconscionability. The breadth of such a holding would be sweeping. It is not surprising that other courts have recognized that the language in *Frank's Maintenance* indicates that the court was primarily concerned with procedural unconscionability. *See Kinkel*, 857 N.E. 2d at 250.

Furthermore, even if the latency of a defect were a dominant factor in finding such a waiver substantively unconscionable (on the theory that the undetectable nature of the defect makes it particularly likely that the buyer will suffer uncompensated consequential damages), American Licorice presented no evidence that the type of latent defect alleged here was particularly unusual or

18

unforeseeable for a party in Plaintiff's position, or that Plaintiff could not have otherwise protected itself from the risk. To the contrary, a large and sophisticated food manufacturer such as Plaintiff would know that there is a risk of adulterated ingredients. Nor did Plaintiff introduce evidence that tends to show that testing for lead or other similar adulterants in its ingredients within a reasonable period after delivery would be either difficult or costly.[16] Quite the opposite--it appears that Plaintiff knows how to test its ingredients for lead should it want to, as it did when conducting its investigation into the source of the contamination of its recalled licorice. *See, e.g.*, FAC ¶ 28. At bottom, a sophisticated party like Plaintiff surely knew (or should have known) of the risk of adulteration and could have prevented or mitigated it by testing the ingredients before using them or negotiating the removal of the waiver position. Nevertheless, Plaintiff chose to sign a contract which allocated the risks to itself, and then further chose not to take steps (*i.e.*, test its product or ingredients for adulterants) to mitigate those risks.

As noted above, Illinois law no longer disfavors bargained-for limits on consequential damages. *Compare. Intrastate Piping*, 733 N.E. 2d at 725 ("While the Uniform Commercial Code disfavors contractual provisions which leave the non-breaching party without a remedy, it does not disfavor limits on recoverable damages. We believe this includes incidental, as well as consequential, damages.") *with Frank's Maintenance*, 408 N.E. 2d at 410 (noting that the UCC "disfavors the limitation of remedies" and "provides that the remedies provided [under the Code] shall be liberally construed"). Instead, Illinois law appears to allow businesses (as distinct from consumers) substantial leeway to allocate the risks of consequential damages in the bargaining process without rendering the remedy limitations unconscionable. *See Id.* at 725-26 (remarking that the parties "were sophisticated business, capable of protecting their own interests – and appropriately allocating risks – in the bargaining process. That is what they did. The remedy limitations were not unconscionable"). The Court therefore finds that the consequential damages

---

[16] As noted previously, Plaintiff did provide evidence that it is not standard practice to test molasses specifically for lead, but that is not the question. The question is whether a reasonable party in Plaintiff's position (*i.e.*, a seller of foodstuffs to the general public) would be so surprised to learn that an ingredient arrived adulterated that it would be unfair to enforce a consequential damages waiver against them in such circumstances.

limitation of the Sales Contract is not substantively unconscionable, and grants Defendant's motion for partial summary judgment. The limitation is enforceable against Plaintiff.

## IV. CONCLUSION

The Court **GRANTS** Defendant's motion for summary judgment that the Purchase Order is not a valid modification of the Sales Contract, and that the consequential damages limitation in the Sales Contract is enforceable. The Court **DENIES** the Defendant's motion for summary judgment that certain of Plaintiff's claims are barred for failure to comply with the Sales Contract's 45-day notice period, and that the Sales Contract effectively disclaims both express and implied warranties.

This order disposes of Docket No. 94.

IT IS SO ORDERED.

Dated: October 22, 2014

_____
EDWARD M. CHEN
United States District Judge

20